### TROUZZO v. SUTHERLAND.

(Supreme Court, Appellate Division, Second Department. May 2, 1912.)

CARRIERS (§ 318*)—ACTION FOR PERSONAL INJURIES—SUFFICIENCY OF EVIDENCE—CAUSING PASSENGER TO FALL FROM CAR.

Evidence in an action against a street railroad for personal injuries, where the only issue was whether the conductor, after plaintiff had reached a safe place upon the car and was about to take his seat as a passenger, wrongfully and intentionally, by threats and hostile demonstrations, drove plaintiff from the car and caused him to fall, *held* not sufficient to sustain a verdict for plaintiff.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1270, 1307–1314; Dec. Dig. § 318.*]

Appeal from Trial Term, Westchester County.

Action by Francesco Trouzzo against Leslie Sutherland, as Receiver of the Yonkers Railroad Company. From a judgment of the Supreme Court in favor of the plaintiff, and from an order denying his motion for a new trial, defendant appeals. Judgment and order reversed, and new trial granted.

Argued before JENKS, P. J., and HIRSCHBERG, THOMAS, CARR, and WOODWARD, JJ.

Leverett F. Crumb, of Peekskille, for appellant.
Sydney A. Syme, of Mt. Vernon, for respondent.

JENKS, P. J. The action is for negligence. The court charged, without exception or request for other instruction:

"The only ground upon which a verdict can be given to the plaintiff, and the only charge that the plaintiff makes against the defendant, is that after the plaintiff had reached a safe place upon this car, and was about to take his seat thereon as a passenger, that the conductor wrongfully, intentionally, recklessly, wantonly, by threats and hostile demonstrations, drove him from the car, and caused him to fall."

The plaintiff is a man 28 years old. The scene of the accident was a street in the city of Yonkers, and the time was about 6 o'clock September 10, 1910. There is no dispute that the plaintiff as a passenger boarded the open or summer car of the defendant on the so-called "off side"—that nearest to the track for cars coming in the opposite direction. At that time the running board was down. The plaintiff's version is as follows: When he boarded the car, it

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

was at a standstill. The side rail was "standing way up high," so that he passed into the car under it without interference therefrom. When he was about to take a seat, or had taken it, the conductor, who was inside of the car and had been looking towards the station, turned and saw him, whereupon the conductor jumped towards him, called him the vilest names, and ordered him to "jump right off now." At that time the plaintiff was sitting down, and the conductor was standing up, with a seat or an aisle between them, and, as the conductor approached the plaintiff with his fists up, the plaintiff drew himself back towards the outside of the car, holding on to the bar rail and avoiding the conductor's fists, when one foot slipped down, followed by the other as he was still clinging on to the bar, then the board fell right under his feet, and he went down with his face up. The conductor testifies that he was on the rear platform; that the plaintiff ran and jumped upon this off side of the car while it was in motion, and hung on to the side rail, which was down; that he called out to the plaintiff, asking him why he did such thing, but the plaintiff paid no attention and remained in the said position; that he saw the oncoming car, with its danger to the plaintiff; that thereupon he rang an emergency bell to stop the car, called to the plaintiff to get in under the rail, crossed to him, took hold of him, attempted to pull him into the car, but failed, as the plaintiff released his hold and fell from his grasp. He denies the language and any threatening words or actions. There is no question but that the position of the plaintiff outside of the body of the car was perilous, in that the oncoming car probably would have struck him, for the space was very narrow between passing cars.

There are some strange features in the plaintiff's story. The conductor and the plaintiff were unknown to one another. Although the plaintiff says he entered the car at the wrong side, yet he also says that he had passed from the running board under the raised side rail and had taken his seat. Only after he had done this the conductor, who had not been looking in his direction when he boarded the car, turned to see him, and thereupon assailed him with vile language, threatened him with assault, made menacing motions, and ordered him to "jump right off" the car. On the other hand, the version of the conductor has earmarks of probability. If the plaintiff had run after a moving car and had jumped on the off side, when the side rail was down, it was natural that the conductor would ask him why he did so. If he remained clinging on to the rail in a position of peril in view of the oncoming car, it was natural that the conductor would attempt to avert the danger by calling to him to get under the rail into the car, and would seek to save him from the danger by taking hold of him to pull him into the car. When, therefore, I find that the plaintiff is supported by but a single witness, a fellow workman who is but slightly acquainted with English, and that the conductor is corroborated by a large number of witnesses who contradict the plaintiff in almost every detail, I think the verdict is against the evidence.

The support of the plaintiff is Fiuro, who corroborates the plaintiff save with respect to the position of the handrail, and who qualifies somewhat a previous statement that the conductor ordered the plaintiff to get off the car. Fourteen witnesses were called by the defendant. Outside of the motorman and conductor of the car, the motorman of the approaching car, and an employé off duty who was riding beside the latter motorman, they appear as respectable persons with entire indifference between the parties. One was riding upon the front platform of the approaching car, two were passengers on the car itself, and the others were wayfarers in the city street, but observers close at hand. Not every witness contradicts each detail of the plaintiff's version, not every witness corroborates every feature of the story of the conductor, but the contradictions of the plaintiff are made in every instance by several, as are the corroborations of the conductor. There are witnesses who testify that the car was in motion when the plaintiff boarded it; that the side rail was down at the time and remained down; that the plaintiff never entered the car at all but remained clinging to the side rail; that the conductor asked him why he thus boarded the car; that the conductor rang the emergency bell; that he cried out to the plaintiff to "get in under the rail"; and that he tried to help him into the car, but could not. There is also evidence from some of the witnesses that there was neither vile nor abusive language used by the conductor, and that there was neither threat nor act of any threatened violence on his part. And, further, there is evidence that the plaintiff's sole witness was not on the car until after the accident in flat contradiction of his testimony. It is true that, under the sharp cross-examination of the learned counsel for the plaintiff, some of these witnesses qualified their direct testimony in some respects, and were shown inconsistent with respect to their testimony upon a former trial, and that the conductor admitted that a former statement made to some outside inquisitor that there were two of the countrymen of the plaintiff on the car (Fiuro being referred to, in all probability) was an untruth. But the witnesses were not shaken in the essentials of their evidence. On the other hand, as I have said, the plaintiff was contradicted in every detail by several and often by many of the witnesses. But it may be said that, although the conductor actually did not intend to commit any violence or to make him leave the car under threat of violence, yet, if in the exercise of reasonable care, the plaintiff mistook the conductor's words and acts, believed he was in danger of violence, and under such duress put himself in a place of peril, the defendant might be liable for the consequences; for the plaintiff was not bound to realize that the conductor's purpose was humane, but was justified to act upon appearances. The answer to that proposition in this case is that the preponderance of the evidence fails to show any ambiguous words or acts. The conductor undoubtedly asked the plaintiff why he thus boarded the car, but the overwhelming evidence as to the conductor's language and acts thereafter did not justify the plaintiff in his subsequent actions, even if we credit his version.

The verdict is against the weight of evidence, and under the rule of Kaare v. Troy Steel & Iron Co., 139 N. Y. 369, 34 N. E. 901, there must be reversal and a new trial, costs to abide the event. All concur.